FILED
SEP 1 2 2008
CLERK, U.S. DISTRICT COURT
NORFOLK, VA

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

JAMES M. GORDON,

Plaintiff,

v.

CIVIL ACTION NO. 2:08cv438

GASTROENTEROLOGY CONSULTANTS, LTD.,
a Virginia Corporation,

**Serve: Vincent J. Mastracco, Jr.,
Registered Agent
150 W. Main Street, Suite 2100
Norfolk, VA 23510**

and

GASTROINTESTINAL AND LIVER SPECIALISTS OF TIDEWATER, PLLC,
a Foreign Corporation,

**Serve: T. Braxton McKee
Registered Agent
150 W. Main Street, Suite 2100
Norfolk, VA 23510**

and

IRVING PIKE,

**Serve: 1004 Cannonbury Common
Virginia Beach, VA 23452**

and

TRENT MARTIN,

**Serve: 1020 Independence Blvd
Virginia Beach, VA 23455**

Defendants.

## COMPLAINT

Plaintiff James M. Gordon ("Dr. Gordon"), by counsel, for his Complaint against Gastroenterology Consultants, Ltd. ("GCL") Gastrointestinal and Liver Specialists of Tidewater, PLLC (the "Specialist Group"), Irving Pike ("Pike"), and Trent Martin ("Martin") states as follows:

**Introduction**

1. This is a breach of contract, tortious interference and conversion action resulting from the defendants' wrongful conduct surrounding Dr. Gordon's resignation from GCL. As detailed herein, various combinations of the defendants wrongfully denied Dr. Gordon compensation to which he is entitled by, among other things, failing to make required payments to Dr. Gordon, intentionally interfering with Dr. Gordon's contracts, intentionally manipulating and misrepresenting compensation that is owed to Dr. Gordon and intentionally exerting control over monies that rightfully belonged to Dr. Gordon.

**Parties, Jurisdiction and Venue**

2. Dr. Gordon is a physician specializing in the practice of gastroenterology, who is a full-time resident and citizen of the state of Arizona.

3. GCL is a Virginia professional corporation with its principal place of business in Virginia Beach, Virginia. It is a member of the Specialist Group, and constitutes an Operating Division (defined below) of the Specialist Group. Prior to becoming a member of the Specialist Group, GCL provided gastroenterology services through its physician employees to members of the general public.

4. The Specialist Group is a Virginia professional limited liability company whose members are medical groups ("Operating Divisions"), including GCL, that specialize in

providing gastroenterology services through its physician employees to members of the general public. The Specialist Group has its principal place of business in Chesapeake, Virginia. All of the member groups of the Specialist Group have their principal place of business in Virginia and are organized under the laws of Virginia.

5. Pike is a physician, and a resident and citizen of the Commonwealth of Virginia and, throughout the period relevant to the allegations set forth in this Complaint, has served as president of GCL and as a member of the Specialist Group.

6. Martin is a physician, and a resident and citizen of the Commonwealth of Virginia and, throughout the period relevant to the allegations set forth in this Complaint, has served as manager of GCL and as a member of the Specialist Group.

7. Jurisdiction of the Court over this action is conferred by 28 U.S.C. §§ 1331 and 1338. All of the defendants are of diverse citizenship to the plaintiff and the amount in controversy as to each defendant is over $75,000.00.

8. Venue lies in this district pursuant to 28 U.S.C. § 1391 because jurisdiction for this action is founded solely on diversity of citizenship and all the defendants reside within the Eastern District of Virginia. Additionally, a substantial part of the events or omissions giving rise to the claims recited occurred in this district.

**The Formation of GCL and the Specialist Group**

9. GCL was incorporated as a professional corporation to provide medical services to the public. All of GCL's shareholders have been and continue to be physicians who specialize in gastroenterology services. The physician shareholders of GCL are parties to (1) the Agreement, dated January 1, 1989, as amended by the Agreement dated January 1, 1992, (2) the Agreement dated October 7, 1996, (3) the Amendment to Agreement dated December 1, 1999

and (4) the Joinder to Restrictive Stock Agreement dated July 1, 2002 (collectively the "Restrictive Stock Agreement"). A copy of the complete Restrictive Stock Agreement is attached as Exhibit A.

10. Pike is the current president of GCL and has served in that role since 2001.

11. The Specialist Group was formed in 1997 for the purpose of practicing medicine and entering into contracts and engaging in business activities necessary or incidental to said purposes.

12. Each of the members of the Specialist Group, including GCL, is a medical group that constitutes an Operating Division of the Specialist Group. The Specialist Group is governed by (1) the First Amended and Restated Operating Agreement of Gastrointestinal and Liver Specialists of Tidewater, PLLC effective July 1, 2003 ("Operating Agreement"), (2) the First Amendment to the First Amended and Restated Operating Agreement of Gastrointestinal Specialists of Tidewater, PLLC dated December __, 2004 ("First Amendment"), and (3) the Second Amendment to the First Amended and Restated Operating Agreement of Gastrointestinal and Liver Specialists of Tidewater, PLLC dated March 15, 2006 ( the "Second Amendment," and collectively with the Operating Agreement and the First Amendment, the "Specialist Group Operating Agreement"). A copy of the complete Specialist Group Operating Agreement is attached as Exhibit B.

13. The Specialist Group is managed by a Board of Managers selected by the respective Operating Divisions, including GCL. The managers appointed by GCL for the period relevant to this Complaint were Trent M. Martin and Brent W. Geissinger. The day-to-day operation of each Operating Division, including GCL, is delegated to each respective Operating Division and the physician-employee designated by a majority of the physician-employees in

such Operating Division. In the case of GCL, Martin and Geissinger were designated to exercise such authority.

14. Each Operating Division of Specialist Group, including GCL, establishes its own budget, is responsible for the payment of all expenses incurred directly by or in respect of such Operating Division, establishes call schedules and duties, establishes office hours and schedules, manages staff personnel (including hiring, firing and discipline), purchases supplies, pays accounts receivables, performs billing and collection functions on behalf of Specialist Group for services provided by such Operating Division and determines physician-employee compensation subject to the Specialist Group's approval and/or ratification. The shareholders of each Operating Division, including GCL, are entitled to profit exclusively from the success of their respective Operating Division. For instance, if GCL were to have an extremely profitable year, it would be the GCL shareholders alone, and not any of the shareholders of the other Operating Divisions, who would profit from that success.

15. Pursuant to the Second Amendment, GLC possesses six (6) units of participation, out of 25 total units, and twenty-four percent (24%) of the total economic interest of the Specialist Group. See Second Amendment.

16. GCL has been an Operating Division of the Specialist Group since January 1, 1998.

**Dr. Gordon's Employment by the Specialist Group**

17. On June 14, 1999, Dr. Gordon became an employee of GCL. On July 1, 2002, Dr. Gordon and the Specialist Group entered into an employment agreement, which required Dr. Gordon to provide health care services to Specialist Group patients (the "Employment Agreement"). From July 1, 2002 through March 31, 2007, Dr. Gordon provided

gastroenterology services at the facilities of GCL, pursuant to his Employment Agreement with Specialist Group. A copy of the Employment Agreement is attached as Exhibit C.

18. Pursuant to the Employment Agreement, Dr. Gordon's annual compensation consisted of two components, a fixed monthly draw and a variable amount equal to an allocated share of the GCL Operating Division's net revenue, as defined in the Employment Agreement, which is determined at the end of each year.

19. Because a significant portion of Dr. Gordon's income is based on GCL's net income, it will vary depending on the amount of revenue collected by GCL during the year.

**Dr. Gordon's Ownership Interest in GCL**

20. On July 1, 2002, Dr. Gordon purchased 2,250 shares of GCL (the "Shares") through which he became a ¼ owner of GCL. As consideration for his purchase of the Shares, Dr. Gordon executed a promissory note payable to GCL in the principal amount of $23,500.00 (the "Stock Purchase"). After the Stock Purchase, the shareholders of GCL were as follows: Pike: 2,250 shares; Trent M. Martin: 2,250 shares; Jacqueline Salcedo: 2,250 shares; and Dr. Gordon: 2,250 shares.

21. As part of the Stock Purchase, Dr. Gordon and the other shareholders in GCL entered into a Joinder to Restrictive Stock Agreement, dated July 1, 2002 (the "Joinder Agreement"), in which all parties agreed to be bound by the terms of the Restrictive Stock Agreement. A copy of the Joinder Agreement is attached as part of Exhibit A.

22. On December 31, 2002, Dr. Gordon paid in full the $23,500.00 promissory note to GCL, which fully vested Dr. Gordon's ownership of the Shares, backdated to July 1, 2002.

**Dr. Gordon's Resignation from GCL and the Specialist Group**

23. In 2006, Dr. Gordon provided GCL with proper notice that he intended to resign

from GCL.

24. Pursuant to his resignation, Dr. Gordon sold his shares in GCL effective as of February 28, 2007, but Dr. Gordon's actual effective resignation date under the Employment Agreement was March 31, 2007.

25. Pursuant to the terms of the Employment Agreement, and his eight (8) years of service to the Specialist Group and GCL, Dr. Gordon was entitled to receive additional deferred compensation based on GCL's accounts receivables and work in progress as of the resignation date (the "Deferred Compensation"). See Employment Agreement, Schedule C, ¶ 8.

26. The Deferred Compensation was to be

> equal to a fraction, the numerator of which is one and the denominators of which is the number of [GCL] Physician-Shareholders...of [GCL's] accounts receivables and work in progress at the time of [the resignation] less (i) a ten percent (10%) fee representing the cost of collection of [GCL's] accounts receivables..., (ii) any such accounts receivable deemed uncollectible by the accountant then serving [GCL], (iii) Physician's Direct Expenses that have accured as of the [resignation], but not yet paid, and (iv) Overhead Expenses that have accrued as of the sate of the [resignation], but not yet paid.

Id.

27. Dr. Gordon was to receive the Deferred Compensation "over a two (2) year period during which [Dr. Gordon] shall receive fifty percent (50%) of his deferred compensation at the end of each year beginning of the first anniversary of the date of termination." Id. at subparagraph (c).

**The Specialist Group's Breach of the Employment Agreement**

28. The effective date of Dr. Gordon's resignation was March 31, 2007.

29. Pursuant to the Employment Agreement, Dr. Gordon was due the first of two payments for the Deferred Compensation on the first anniversary of his resignation, which was

March 31, 2008.

30. The Specialist Group failed to make the required Deferred Compensation payment on March 31, 2008.

31. Despite demand, the Specialist Group has refused to pay Dr. Gordon any Deferred Compensation.

**Pike's and GCL's Manipulation of the Collected Accounts Receivables**

32. During the Resignation Period, GCL's collected accounts receivables were significantly lower than their historic averages and GCL failed to collect a significant portion of the fees that were properly owed to it.

33. After the end of the Resignation Period, GCL's collected accounts receivables increased to levels at least consistent with GCL's historical accounts collection average. GCL not only began collecting significantly more fees from ongoing work, but also began collecting a considerable amount of accounts receivables that were incurred during the Resignation Period.

34. Based on these sudden and dramatic changes in collected accounts receivables, it is clear that GCL purposely failed to collect accounts receivables during the Resignation Period in an attempt to decrease Dr. Gordon's annual compensation.

35. Pike, as the President of GCL, and Martin, as a manager of GCL, knew, or should have known, of this intentional pattern of selective collection practices, and either orchestrated it or failed to stop it, to the detriment of Dr. Gordon.

36. Pike and Martin were aware of Dr. Gordon's Employment Agreement and of the annual compensation due to Dr. Gordon thereunder. Pike, as president of GCL, and Martin, as a manager of GCL, were aware that a decrease in the collected accounts receivables would also decrease Dr. Gordon's annual compensation.

37. The subsequent increase in the collections after the significant decrease in collections during the Resignation Period resulted in a decrease in compensation paid to Dr. Gordon and in an increase in the compensation paid to Pike, Martin and the other shareholders of GCL in 2008.

38. Additionally, on information and belief, Dr. Gordon holds a good faith belief that an additional investigation of the facts in this matter, through the discovery process, will reveal that Pike, Martin and Arlene Davies directed and coordinated the reduction in collected accounts receivables to decrease Dr. Gordon's annual compensation.

**COUNT I (Breach of Contract against the Specialist Group)**

39. Dr. Gordon hereby incorporates paragraphs 1-38 above as if fully restated herein.

40. Under the Employment Agreement, the Specialist Group is required to pay Dr. Gordon annual compensation and Deferred Compensation upon the first anniversary of the effective date of his termination of the Employment Agreement.

41. The Specialist Group has breached the Employment Agreement by failing to pay Dr. Gordon the proper amount of annual compensation during the Resignation Period.

42. The Specialist Group has breached the Employment Agreement by refusing to pay Dr. Gordon any Deferred Compensation despite it becoming due on March 31, 2008.

43. Additionally, as a result of the Specialist Group's breach of the Deferred Compensation provision of the Employment Agreement, Dr. Gordon is entitled to recover from Specialist Group "all costs and expenses (including, without limitation, reasonable attorneys' fees) incurred by [Gordon] with respect to enforcement of" this provision. See Employment Agreement p. 21, §22.

44. As a direct and proximate result of Specialist Group's breaches of the

Employment Agreement, Dr. Gordon has suffered damages in an amount in excess of $76,000.00, the exact amount to be proven at trial, plus pre- and post-judgment interest and attorneys' fees.

45. As a direct and proximate result of Specialist Group's breaches of the Employment Agreement, Dr. Gordon is due and owing from Specialist Group damages in an amount in excess of $76,000.00, the exact amount to be proven at trial, plus pre- and post-judgment interest and attorney's fees.

**COUNT II (Tortious Interference with Contract by GCL)**

46. Dr. Gordon hereby incorporates paragraphs 1-45 above as if fully restated herein.

47. Dr. Gordon had a valid contractual relationship with the Specialist Group through his employment pursuant to the Employment Agreement.

48. GCL was aware of Dr. Gordon's Employment Agreement with the Specialist Group.

49. GCL was aware that Dr. Gordon's compensation under the Employment Agreement was determined, in part, by the accounts receivables of GCL.

50. GCL intentionally failed to collect the accounts receivables due to GCL in order to limit Dr. Gordon's annual compensation under the Employment Agreement from the Specialist Group, and which caused the Specialist Group to breach the Employment Agreement by failing to pay both annual compensation and Deferred Compensation owed to Dr Gordon.

51. Because of GCL's interference, Specialist Group breached the Employment Agreement by failing to pay Dr. Gordon the proper amount of annual compensation and Deferred Compensation.

52. As a direct and proximate result of GCL's tortious interference with the Employment Agreement, Dr. Gordon has suffered damages in an amount in excess of $76,000.00, the exact amount to be proven at trial, plus pre- and post-judgment interest and attorneys' fees.

53. As a direct and proximate result of GCL's tortious interference with the Employment Agreement, Dr. Gordon is due and owing from GCL damages in an amount in excess of $76,000.00, the exact amount to be proven at trial, plus pre- and post-judgment interest and attorney's fees.

**COUNT III (Tortious Interference with Contract by Pike and Martin)**

54. Dr. Gordon hereby incorporates paragraphs 1-53 above as if fully restated herein.

55. Dr. Gordon had a valid contractual relationship with the Specialist Group through his employment pursuant to the Employment Agreement.

56. Pike and Martin were aware of Dr. Gordon's Employment Agreement with the Specialist Group.

57. Pike and Martin were aware that Dr. Gordon's compensation under the Employment Agreement was determined, in part, by the accounts receivables of GCL.

58. Pike and Martin either intentionally failed to collect the accounts receivables due to GCL in order to limit Dr. Gordon's annual compensation under the Employment Agreement from the Specialist Group or knew or should have known of this occurring, had a duty to stop it and failed to stop it, either of which caused Specialist Group to breach the Employment Agreement by failing to pay both annual compensation and Deferred Compensation owed to Dr Gordon.

59. Because of Pike and Martin's intentional interference, Specialist Group breached

the Employment Agreement by failing to pay Dr. Gordon the proper amount of annual compensation and Deferred Compensation.

60. As a direct and proximate result of Pike and Martin's tortious interference with the Employment Agreement, Dr. Gordon has suffered damages in an amount in excess of $76,000.00, the exact amount to be proven at trial, plus pre- and post-judgment interest and attorneys' fees.

61. As a direct and proximate result of Pike and Martin's tortious interference with the Employment Agreement, Dr. Gordon is due and owing from GCL damages in an amount in excess of $76,000.00, the exact amount to be proven at trial, plus pre- and post-judgment interest and attorney's fees.

## COUNT IV (Conversion by GCL)

62. Dr. Gordon hereby incorporates paragraphs 1-61 above as if fully restated herein.

63. Dr. Gordon's annual compensation was based, in part, on the collected accounts receivables of GCL.

64. GCL intentionally decreased the collected accounts receivables during the Resignation Period to limit Dr. Gordon's annual compensation for that period.

65. After the Resignation Date, GCL began increased efforts to collect the account receivables that were incurred during the Resignation Period.

66. As a result of these efforts, GCL was able to collect significant amounts of money that should have normally been collected during the Resignation Period and that Dr. Gordon normally would have received proceeds from as part of his annual compensation.

67. GCL failed to pay any of these funds to Dr. Gordon and, on information and

belief, have used these funds for its own purposes.

68. As a result, GCL exercised an unauthorized right of ownership over the portion of these funds that should have been paid to Dr. Gordon and that rightfully belong to Dr. Gordon.

69. Despite protest from Dr. Gordon, GCL has excluded Dr. Gordon from his lawful right to these funds.

70. This amounts to a conversion of collected funds that should have been paid to Dr. Gordon but were not because of GCL's unauthorized assumption of control over the funds.

71. As a direct and proximate result of GCL's conversion, Dr. Gordon has suffered damages in an undetermined amount, the exact amount to be proven at trial, plus pre- and post-judgment interest and attorneys' fees.

72. As a direct and proximate result of GCL's conversion, Dr. Gordon is due and owing from GCL damages in an undetermined amount, the exact amount to be proven at trial, plus pre- and post-judgment interest and attorney's fees.

**COUNT V (Conversion by Pike and Martin)**

73. Dr. Gordon hereby incorporates paragraphs 1-72 above as if fully restated herein.

74. Dr. Gordon's annual compensation was based, in part, on the collected accounts receivables of GCL.

75. Pike and Martin either intentionally decreased the collected accounts receivables during the Resignation Period to limit Dr. Gordon's annual compensation for that period or knew or should have known of this occurring, had a duty to stop it and failed to stop it.

76. After the Resignation Date, Pike and Martin began increased efforts to collect the account receivables that were incurred during the Resignation Period.

77. As a result of these efforts, Pike and Martin were able to collect significant

amounts of money that should have normally been collected during the Resignation Period and that Dr. Gordon normally would have received proceeds from as part of his annual compensation.

78. Pike and Martin failed to pay any of these funds to Dr. Gordon and, on information and belief, have used some or all of these funds for his own purposes.

79. As a result, Pike and Martin exercised an unauthorized right of ownership over the portion of these funds that should have been paid to Dr. Gordon and that rightfully belong to Dr. Gordon.

80. Despite protest from Dr. Gordon, Pike and Martin has excluded Dr. Gordon from his lawful right to these funds.

81. This amounts to a conversion of collected funds that should have been paid to Dr. Gordon but were not because of Pike and Martin's unauthorized assumption of control over the funds.

82. As a direct and proximate result of Pike and Martin's conversion, Dr. Gordon has suffered damages in an undetermined amount, the exact amount to be proven at trial, plus pre- and post-judgment interest and attorneys' fees.

83. As a direct and proximate result of Pike and Martin's conversion, Dr. Gordon is due and owing from GCL damages in an undetermined amount, the exact amount to be proven at trial, plus pre- and post-judgment interest and attorney's fees.

**COUNT VI (Enforcement of a Constructive Trust)**

84. Dr. Gordon hereby incorporates paragraphs 1-83 above as if fully restated herein.

85. GCL unjustly failed to collect certain accounts receivables in order to limit Dr.

Gordon's annual compensation.

86. Pike and Martin either unjustly failed to collect certain accounts receivables in order to limit Dr. Gordon's annual compensation or knew or should have known of this occurring, had a duty to stop it and failed to stop it.

87. After the end of Resignation Period, Pike and GCL successfully made renewed or increased efforts to collect accounts receivables incurred during the Resignation Period.

88. Pike and GCL are subject to an equitable duty to convey to Dr. Gordon a portion of these collected accounts receivables on the grounds that Pike and GCL would be unjustly enriched if they were permitted to retain the funds.

89. It is necessary, equitable and appropriate to impress a constructive trust on the accounts receivables of GCL and Specialist Group that were collected after the Resignation Date, but that were incurred during the Resignation Period and that are due and owing to Dr. Gordon, and order that GCL act as a trustee of such a trust in favor of Dr. Gordon, in order to prevent a fraud or injustice, which would otherwise ensue.

WHEREFORE, James M. Gordon, by counsel, requests that this Court grant the following relief:

(a) the entry of judgment against the Specialist Group in such amounts as are proved to be owing under Count I, plus pre- and post-judgment interest and attorneys' fees;

(b) the entry of judgment against GCL in such amounts as are proved to be owing under Count II, plus pre- and post-judgment interest and attorneys' fees;

(c) the entry of judgment against Pike and Martin, jointly and severdly, in such amounts as are proved to be owing under Count III, plus pre- and post-judgment interest

and attorneys' fees;

(d) the entry of judgment against GCL in such amounts as are proved to be owing under Count IV, plus pre- and post-judgment interest and attorneys' fees;

(e) the entry of judgment against Pike and Martin, jointly and severdly, in such amounts as are proved to be owing under Count V, plus pre- and post-judgment interest and attorneys' fees;

(f) ordering the enforcement of a constructive trust on the accounts receivables of GCL and Specialist Group that were collected after the Resignation Date and that are due and owing to Dr. Gordon, but that were incurred during the Resignation Period, and order that GCL act as a trustee of such a trust in favor of Dr. Gordon; and

(g) such other and further relief as may be appropriate.

JAMES M. GORDON

By: ______________________
Of Counsel

Robert L. Samuel, Jr., Esquire (VSB # 18605)
Matthew S. Sheldon, Esquire (VSB #73734)
Counsel for Plaintiff Dr. James M. Gordon
Williams Mullen
A Professional Corporation
222 Central Park Avenue, Suite 1700
Virginia Beach, Virginia 23462
757.499.8800 (telephone)
757.473.0395 (facsimile)
rsamuel@williamsmullen.com
msheldon@williamsmullen.com

1283612v6